**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | |
|---|---|
| Kendra J. Carpenter,<br><br>                    Plaintiff,<br><br>          v.<br><br>City Of Florence,<br><br>                    Defendant. | **COMPLAINT**<br>**(Jury Trial Demanded)** |

The Plaintiff, Kendra J. Carpenter, by and through her undersigned counsel, complaining of the Defendant herein, alleges as follows:

## PARTIES & JURISDICTION

1.   The Plaintiff, Kendra J. Carpenter, (hereinafter referred to as "Plaintiff") is a citizen and resident of Florence County, South Carolina, and was in the employ of the Defendant City of Florence Police Department from December 2004 until October 1, 2014, most recently as a Senior Police Officer and Victim's Advocate.

2.   The Defendant, City of Florence,  (hereinafter referred to as the "City"), is a municipal subdivision of the State of South Carolina with its principal offices located at 324 W. Evans Street, Florence, SC 29501.

3.   This action arises under Title VII of the Civil Rights Act of 1964, The Civil Rights Act of 1991 with amendments thereto, as well as the statutory and case law of the State of South Carolina.

4.   Jurisdiction exists pursuant to 28 U.S.C. § 1343 (4) which gives the District Court original jurisdiction over any civil action authorized by law to be commenced by any person to recover damages under any Act of Congress providing for protection of civil rights.

5.  Venue lies within the Florence Division pursuant to 28 U.S.C. § 1391(b) because Defendant City is located in this judicial district and most of the events giving rise to this action occurred within the Florence Division.

6.  Charges have been filed with appropriate state and federal agencies, right-to-sue letters have been received and this action is timely.

## Factual Allegations

7.  The Plaintiff is a white/Native American female who has worked for Defendant City for approximately ten (10) years and performed her duties in a successful manner.

8.  In December 2004, Plaintiff began working for Defendant City as a Complex Officer.

9.  After graduating from the police academy in May 2005, Plaintiff worked for approximately five (5) years as a Patrol Officer for Defendant City.

10. In 2010, Plaintiff applied for and was placed in the position of Victim's Advocate for Defendant City. As a Victim's Advocate for Defendant City, the Plaintiff was tasked with being the City's liaison to victims and their families.

11. In March 2012, Lieutenant Tim Compton ("Lieutenant Compton"), a white male, became Plaintiff's immediate supervisor.

12. During Lieutenant Compton's first few months in this position, he began to make vulgar, racist, discriminatory, and sexist remarks; as a result thereof, other male employees began to also make similar comments. This inappropriate behavior continued until Plaintiff's suspension on or about September 25, 2014.

13. Many of these inappropriate comments were directed toward Plaintiff, including remarks about her race, Native American, including implications that Kendra would scalp her coworkers, suggestions that Kendra should "do a rain dance" to stop the rain, using their hands to pat their

2

mouth and make the stereotypical Native American sound, and referring to Kendra as "Pocahontas."

14. Lieutenant Compton and other male employees of Defendant City made sexist remarks to and in front of multiple female employees of Defendant City, including Plaintiff. These comments included, amongst others, multiple references to "big hoo-hoos" in a photo included in a report, stating that they needed to get bail money together after seeing a picture of a female arrested for DUI, and commenting that "it would be easier to have sex with her now" in reference to a female domestic abuse victim who had her front teeth knocked out.

15. Many of these discriminatory comments were made at mandatory briefing meetings held every morning.

16. During these morning meetings, it was common for employees to sleep, talk amongst themselves, read, doodle, or use their cell phones. During one of these meetings, Lieutenant Compton instructed the employees to stop using their cell phones, so Plaintiff ceased doing so.

17. Despite this instruction, other employees continued to defy Lieutenant Compton's instruction. However, none of the other employees were admonished for doing so. Instead, in December 2012, Lieutenant Compton came to Plaintiff's office and asked to speak with her. Lieutenant Compton then took Plaintiff into the hallway where other employees were walking by and told Plaintiff that someone had complained about her reading a book during briefing. Plaintiff pointed out the unfair treatment but complied with Lieutenant Compton's request.

18. Soon thereafter, in December 2012, Plaintiff spoke to Lieutenant Compton and specifically requested that he cease the discriminatory treatment and language. Lieutenant Compton replied that he is in charge of running the meetings and will run them as he sees fit, completely dismissing Plaintiff's complaints.

19. Plaintiff then went to Major Carlos Raines ("Major Raines"), a white male and Lieutenant Compton's immediate supervisor, and again complained of the discriminatory language. Major Raines responded by stating that this was a result of Plaintiff's perceptions and added that there are two employees with the position of Victim's Advocate and that only one Victim's Advocate may be necessary, implying that Plaintiff would be terminated if she continued to complain.

20. At the next morning briefing after Plaintiff had complained to Lieutenant Compton and Major Raines, she noticed that employees began making a bird sound, "Ca-caw," whenever something vulgar or discriminatory was said. Plaintiff learned later that these employees had agreed to make this sound as a warning to each other that Plaintiff was nearby.

21. Plaintiff then went to Chief Anson Shells ("Chief Shells"), a black male and the immediate supervisor of Major Raines, and again complained of the discriminatory language. Chief Shells indicated that such discriminatory behavior is not tolerated by him; however, the only solution Chief Shells offered was to transfer Plaintiff, which Plaintiff found unsatisfactory. Plaintiff enjoyed her job, wanted to continue working as a Victim's Advocate, and wanted, instead, for the discriminatory treatment to cease.

22. In February 2013, Plaintiff complained of the discriminatory language to Jennifer Leach ("Ms. Leach"), Human Resources Manager for Defendant City. Ms. Leach indicated she would put a stop to the behavior.

23. Sometime during Ms. Leach's attempts to end the discriminatory treatment, she involved Scotty Davis ("Director Davis"), Director of the General Services Department for Defendant City which oversees both Community Services and the Human Resources Department.

24. Shortly after Plaintiff complained to Ms. Leach, during a morning briefing, Lieutenant Compton requested that Plaintiff leave the briefing and that all other employees remain. While

Plaintiff was not present at the briefing, Lieutenant Compton told the employees that the way they were treating Plaintiff was illegal and that, "The fool had won."

25. On March 1, 2013, an attorney for Defendant City was present for the morning briefing and, after Plaintiff left the briefing at the instruction of HR, told the employees that they could not continue their discriminatory treatment of Plaintiff.

26. Despite these multiple warnings, the discriminatory treatment still continued though in a lesser capacity.

27. On or about March 15, 2013, Plaintiff was called to a follow-up meeting with Human Resources with Ms. Leach and Director Davis, at which Plaintiff indicated the treatment was continuing though to a lesser degree. Director Davis then had Major Raines join the meeting.

28. After speaking with Major Raines, Director Davis threatened Plaintiff with insubordination and told Plaintiff to forget about everything that had happened and to start fresh.

29. Plaintiff then began the process of filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") by filing an Initial Questionnaire in March 2013 and ultimately filing her charge on August 10, 2013.

30. On January 15, 2014, Plaintiff was given her first-ever written warning, having never previously received any bad evaluations, write-ups, demotions, or complaints by victims. This written warning was given to Plaintiff by Major Raines for allegedly not answering her phone on the first ring, putting a victim in jeopardy, and being disrespectful to Lieutenant Compton.

31. Plaintiff's work phone was not in service at the time Lieutenant Compton attempted to call it, which the Department knew, so Lieutenant Compton and an Investigator called Plaintiff's personal phone. At the time, Plaintiff was putting bug poison in her yard and did not have her phone on her so that her phone would not have poison on it. Plaintiff cleaned herself of the poison

and, approximately twenty minutes after the missed phone call, checked her voicemail and returned the phone call. When Plaintiff heard the voicemail, Lieutenant Compton did not indicate the reason for the phone call and asked that Plaintiff return his call "ASAP." When Plaintiff called Lieutenant Compton back, she first identified who she was and then stated she was returning his call "ASAP," which was not intended to be disrespectful; however, Lieutenant Compton used this comment as pretext to justify punishing Plaintiff. After Plaintiff returned the phone call, a uniformed police officer arrived at Plaintiff's home, having been sent there by Lieutenant Compton, at which time Plaintiff informed the uniformed police officer that she had already returned the phone call. The write-up for putting a victim in jeopardy was also based on Plaintiff having not answered her phones on the first ring and was unfounded and used as pretext to punish Plaintiff.

32. Since February 2013, Plaintiff had been working with a rape victim whose mother was Plaintiff's direct contact. In early 2014, the victim's mother contacted Plaintiff to ask why a warrant, to arrest one of the suspects for harassing the victim, was not yet signed. Plaintiff did not know the answer and, after ending the phone call, asked Major Raines. Major Raines began yelling aggressively at Plaintiff, stating that Plaintiff is not the victim's counselor, that Plaintiff works for the Department, and that helping this victim with this warrant is not Plaintiff's job. Plaintiff remained calm, despite the abusive treatment, and attempted to leave the office; however, Major Raines followed Plaintiff into the hall, where Major Raines continued to berate Plaintiff.

33. Soon thereafter, Plaintiff met with City Manager Drew Griffin ("City Manager Griffin") and complained of being yelled at by Major Raines. City Manager Griffin stated that Plaintiff's treatment seemed like a hostile work environment and that he would get in touch with Ms. Leach about this.

34. On May 8, 2014, Plaintiff was called to a counseling session by Major Raines who then wrote Plaintiff up for questioning why the warrant was prevented from being signed and for other unfounded, intentionally inaccurate reasons.

35. During her employment, Plaintiff and the other female Victim's Advocate were not paid for their lunch hour, whilst all other officers were paid for their lunch hour.

36. In June 2014, a memo about harassment in the workplace was distributed to supervisors with the intent for all supervisors to go over the memo with all employees. Upon information and belief, this memo was not further discussed nor distributed after being distributed to supervisors. No one ever discussed this memo with Plaintiff.

37. On September 22, 2014, Lieutenant Compton instructed Plaintiff that they no longer had to make any changes to reports in the computer. Lieutenant Compton said that one individual would be assigned to make changes to reports. At the time, the only changes being made to reports were assignments. Plaintiff even clarified her understanding with Lieutenant Compton.

38. On September 24, 2014, Corporal Cody Jordan and Lieutenant Compton told Plaintiff that she was not correctly putting assignments in the computer. Plaintiff attempted to clarify her understanding of the instructions given to her previously by Lieutenant Compton but was told by Lieutenant Compton that she was arguing and being disrespectful, which was not Plaintiff's intent. Lieutenant Compton ultimately told Plaintiff that she had misunderstood the instructions which were intended to require Plaintiff to stop making corrections to reports in the computer, not to stop putting assignments in the computer. Plaintiff attempted to ensure Lieutenant Compton that she now understood her duties regarding reports in the computer but Lieutenant Compton refused to listen to Plaintiff. During the conversation, Lieutenant Compton requested that Plaintiff close the door, to which Plaintiff responded that she did not feel comfortable being alone with Lieutenant

Compton with the door closed.

39. On September 25, 2014, Chief Allen Heidler ("Chief Heidler") suspended Plaintiff without pay while they investigated whether Plaintiff had refused to abide by Lieutenant Compton's direction to close the door.

40. Plaintiff remained suspended until October 1, 2014, when she was terminated by Chief Heidler for "failure to follow the directive of a supervisor."

41. On December 15, 2014, Plaintiff filed her second Charge of Discrimination.

42. Plaintiff has received her Notice of Right to Sue from the EEOC, dated September 15, 2015.

**FOR A FIRST CAUSE OF ACTION**
**AGAINST DEFENDANT CITY OF FLORENCE**
**(Violation of Title VII - Retaliation)**

43. Where not inconsistent herewith, Plaintiff realleges the foregoing.

44. The Plaintiff complained of discriminatory and unequal treatment and remarks to her supervisors, City Human Resources/Administration and filed a complaint with EEOC/SHAC; all of which constitutes protected activity. Because the Plaintiff complained of the unequal treatment and of discrimination, she was treated disparately, suspended, and ultimately terminated by Defendant for false and pretextual reasons, all constituting unlawful retaliation against the Plaintiff under Title VII of the Civil Rights Act of 1964, The Civil Rights Act of 1991 and amendments thereto, for which Defendant is liable.

45. Plaintiff is entitled to relief including back pay, front pay, actual damages, damages for emotional distress and mental anguish, and any other legal or equitable remedies to which she may be entitled under Title VII. Plaintiff further seeks attorneys' fees and costs, and any allowable prejudgment interest.

**FOR A SECOND CAUSE OF ACTION
AGAINST DEFENDANT CITY OF FLORENCE
(Violation of Title VII – Discrimination and Hostile Work Environment)**

46. Where not inconsistent herewith, Plaintiff realleges the foregoing.

47. The Plaintiff was subjected to racial and sexist treatment by the Defendant City, including inappropriate sexual and racial remarks made by City employees. The Plaintiff made it apparent that she opposed such conduct, however the City failed to take adequate action to stop the treatment which continued. Such treatment was severe and pervasive and created a hostile work environment.

48. Additionally, the Plaintiff was treated differently than the other non-Native American officers; who were not subjected to the same hostility, comments, discipline and standards as the Plaintiff. This conduct amounts to unlawful discrimination against the Plaintiff.

49. The Defendant's conduct towards the Plaintiff is unlawful and gives rise to claims of discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964, The Civil Rights Act of 1991 and amendments thereto, for which Defendant is liable. The Defendant's reasons for such conduct are false and pretextual.

50. Plaintiff is entitled to relief including back pay, front pay, actual damages, damages for emotional distress and mental anguish, and any other legal or equitable remedies to which she may be entitled under Title VII.  Plaintiff further seeks attorneys' fees and costs, and any allowable prejudgment interest.

WHEREFORE, Plaintiff prays for judgment against the Defendant for compensatory and actual damages calculated by a jury as well as an appropriate award of reasonable attorney's fees and costs. Plaintiff also seeks prejudgment interest and any other legal and equitable remedies the Court deems appropriate.

J. LEWIS CROMER & ASSOCIATES, L.L.C.

BY:  s/Julius W. Babb, IV
   J. Lewis Cromer (#362)
   Julius W. Babb, IV (#10500)
   1418 Laurel Street, Suite A (29201)
   Post Office Box 11675
   Columbia, South Carolina 29211
   Phone  803-799-9530
Columbia, South Carolina  Fax 803-799-9533
December 10, 2015

*Attorneys for Plaintiff*

10